# Quigley *versus* The Commonwealth.

1. The evidence in this case contains the ingredients of murder in the first degree.
2. Where a juror is identified by name and residence, both of which are correctly given in the panel, a misdescription of his occupation is not a sufficient ground to sustain a challenge for cause.

February 15th 1877.    Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON and WOODWARD, JJ. WILLIAMS, J., absent.

Error to the Oyer and Terminer of *Philadelphia county :* Of January Term 1877, No. 249.

Indictment of Patrick Quigley for the murder of his wife Catharine Quigley.

The facts of the case are sufficiently stated in the opinion of the court.

The only questions passed upon by this court were first, whether the case presented a clear one of murder in the first degree, and

[Quigley *v.* Commonwealth.]

second, whether a juror could be challenged for cause by the prisoner, the cause assigned being that the juror was named in the return to the venire as "William S. Thompson, whittier, No. 1511 Thompson street, Twenty-ninth Ward."

The juror being examined on his *voire dire*, testified that he resided and had resided for twenty years at 1511 Thompson street; that he was doing no business at the present time, but that he was a "victualler," and that he knew of no such business as "whittier." The court overruled the challenge on the ground that the christian and surname of the juror, with the number of his house, and the name of the street and ward, being accurately given, there was a sufficient description to enable the defendant to learn who was the person to be summoned as a juror.

The jury found a verdict of murder in the first degree, and the prisoner was sentenced to be hanged.   He then took this writ, assigning for error, *inter alia*, the overruling of the foregoing challenge.

*A. S. L. Shields, John O'Byrne, C. M. Smith,* and *W. H. Ruddiman,* for plaintiff in error.—The Act of April 14th 1834, § 88, directs that the name, surname and in addition the occupation and place of abode of the persons selected to be put in the wheel, shall be placed upon strips of paper for that purpose.   In this instance the proper occupation of the juror called was not given correctly, but on the contrary, the return shows an occupation of which the juror called knew nothing and in which he never was employed.

*Henry S. Hagert,* Assistant District Attorney, and *Furman Sheppard,* District Attorney, for the Commonwealth.—We contend that if the word "whittier" is not intended to stand for the trade of "victualler" it is not to be treated as a nullity; for it does not appear by the testimony that this word does not represent some one of the numerous sub-divisions of old occupations or one of the many new occupations which have grown up with the advance in the arts, and with the introduction of machinery and the sub-division of labor.   If, however, it is to be so treated, then we submit that this objection was properly a cause of challenge to the array, and in the case of Clark *v.* Commonwealth, 5 Casey 129, a similar objection was so regarded; for if the sheriff has failed to return the names, residences and occupations of eighty persons, he has made a defective return.   A default in the sheriff in making his return, as the omission to return a knight in a suit by a peer, and the failure to return the statutory number of hundredors upon the panel, was ground for challenge to the array; so if the bailiff of the liberty return any one out of his franchise.   These are all grounds of principal challenge, and are in respect of the default of the officer who made the return, and not in respect of the person returned:

Co. Litt. 156–156 b, *470–3 ; Commonwealth *v*. Salliger, 3 Penna. L. Jour. 520 ; and no challenge to the polls can be taken, which might have been had to the array : Co. Litt. 158 a. Under the English practice, challenges to the array must be spread in full upon the record, and should be so here, so that the opposite party may demur, plead or answer, and so that the correctness of the decision of the court upon the challenge may be examined into : King *v*. Edmonds, 4 B. & Ald. 471 ; Hesketh *v*. Braddock, 3 Burr. 1847.

The challenge made in the present case was a challenge to the *polls*, and if the court below could inquire at all into the ground alleged in this case, it could only be for the purpose of determining whether the person who answered to the call, was the identical person who had been selected, summoned and returned as a juror. Upon that question the court were satisfied by the examination of the juror ; and their decision, if reviewable here, like the decision of any other tribunal upon any other question of fact, is to be sustained, unless clearly repugnant to the evidence. As was held in Clark *v*. Commonwealth, *supra*, there is sufficient to indicate the person as the intended juror ; the provision requiring the occupation or addition is directory merely.

Treating this objection as ground for a challenge to the array, and no such challenge having been taken in the court below, the case is within the protection of the Act of 21st of February 1814 : Purd. Dig. 838, pl. 82.

The judgment of the Supreme Court was entered, March 5th 1877,

PER CURIAM.—There is no merit whatever in the assignments of error in this case. The court properly overruled the challenge to William S. Thompson, a juror. He was identified by name and residence, both of which were correctly given in the panel. The want of accuracy as to his occupation was not sufficient to create a doubt of his identity. The addition was insensible, and not a change of his real occupation. There was nothing to mislead, and therefore no injury arose or could arise from an addition which designated no known occupation or business. But the challenge was not to the array. A challenge to the array always arises from a cause which affects the whole panel. Such is not this case.

In regard to the ingredients of murder in the first degree there is no doubt. The case presents a clear one of murder in the first degree. Indeed the counsel did not themselves raise this question. It came as a merciful suggestion of a member of the court to afford an opportunity of investigating the facts. But this investigation satisfies us the prisoner was properly convicted. That Catharine Quigley, the wife of the prisoner, did not commit suicide but was killed by him is a fact beyond any reasonable doubt upon the evi-

[Quigley *v.* Commonwealth.]

dence, and has been found by the jury. That he shot her twice, once in the eye, the ball penetrating the brain, and once in the face, half way between the eye and the lower end of the nose, is not a subject of doubt, while all the circumstances surrounding the act point to a wilful, deliberate and premeditated intention. He came from the bar-room into the kitchen and told her to take his coat up stairs, she said, "Yes, if you wish it," took the coat down from a hook, and started up stairs, and he walked up close behind her. The witness heard the door of the room above shut, and the latch click. Nothing more was heard for some time, until the witness heard two shots, one within fifteen seconds or thereabouts of the other. The pistol is identified as his; two chambers were found discharged, and an intermediate cartridge struck by the hammer but not exploded. The prisoner remained a long time in the room before he came out, and when he came down went to the hydrant and washed himself. His shirt, from which the blood had been washed, was found in the room with stains upon it. He had changed it for a clean one. After a long time he came down, went to a neighbor's to find a woman, who occupied the upper story of his house, told her to come home, that his wife had met with an accident—had shot herself. When this woman and the man in whose shop she was found came to the room the prisoner's wife was found lying on the floor, her head resting on the stove plate, and the pistol placed on the floor about three feet from her. She was still alive and sensible, and on inquiry, at once accused him of shooting her, pointing to the place where the balls entered. She lived nine days and never recalled her accusation. When in the room he sat on the bed, and refused to help his wife to get-up or to relieve her from her uncomfortable position, giving as a reason that he did not want to bloody his shirt. When accused by her of the shooting he scarcely denied it, but after sitting on the bed for a time he approached her and said, "Did I shoot you, dear Kate?" She said at once, "Yes, you shot me twice; use no endearing words, for if I should die to-morrow, you would lie. If I ever live to get over this, I will not live another day with you."

During the whole affair he exhibited no feeling, smoked his cigar and behaved with the utmost coolness, as well as with entire want of natural feeling. For about an hour and a half he was engaged in the room, and coming down stairs and returning, making no disclosure of the fact, and evidently reflecting and preparing as well as he could to ward off suspicion from himself. They had lived unhappily together and had had difficulties about property belonging to her. They had separated and then come together. Perhaps the fault may have been mutual, but this does not detract from the influence of this unhappy life upon his motives and intentions. The fact is still there that love had ceased, and unholy feelings had taken its place. Under these telling circumstances attending

[Quigley *v.* Commonwealth.]

the homicide, there is no room to raise a defence to his horrid and unnatural act, none to palliate or excuse, none to detract from the intention which the law draws from the act of one who aims a deadly weapon at a vital part, who twice discharges it against this part, and who would have discharged it a third time, but on the failure of the cartridge to ignite. Much of the language in McCue *v.* Commonwealth, 28 P. F. Smith 185, might be applied to this case. Clearly the act was wilful and intentional, and death was the probable and natural consequence of the act. What other intention than an intention to kill can rationally be inferred from the conduct of the prisoner? As said in Cathcart *v.* The Commonwealth, 1 Wright 112, "Human reason will not tolerate the denial that a man who intentionally, not accidentally, fires a musket ball through the body of his wife, and thus inflicts a mortal wound, has a heart fatally bent upon mischief and intent to kill." Much less can human reason deny this wickedness of heart, when a husband not only fires one ball into the brain of his wife, but fires a second time at her head and attempts to fire a third time. There are many minor circumstances in this case lending additional weight to the conclusion, but the main body of the facts is sufficient to support the verdict without their aid.

> The sentence of the court below is affirmed, and the record is ordered to be remitted to the Court of Oyer and Terminer for the purpose of carrying the sentence into execution.